Filed 9/25/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **VITA PLANNING AND LANDSCAPE ARCHITECTURE, INC.,** Plaintiff and Appellant, v. **HKS ARCHITECTS, INC.,** Defendant and Respondent. | **A141010** (Marin County Super. Ct. No. CIV1300681) |

The trial court granted HKS Architects, Inc.'s (HKS) motion to dismiss Vita Planning and Landscape Architecture's (Vita) complaint against HKS pursuant to Code of Civil Procedure section 410.30, subdivision (a) and entered judgment for HKS.[1] Vita appeals. It contends the court erred by granting HKS's motion to dismiss because: (1) there is no contract between Vita and HKS containing a forum selection clause; (2) HKS's motion was untimely and "procedurally waived[;]" and (3) enforcing the forum selection clause violates California public policy articulated in section 410.42, which prohibits enforcement of construction contract provisions requiring disputes between contractors and California subcontractors to be litigated outside California.

---

[1] Section 410.30, subdivision (a) provides: "When a court upon motion of a party or its own motion finds that in the interest of substantial justice an action should be heard in a forum outside this state, the court shall stay or dismiss the action in whole or in part on any conditions that may be just." Unless noted, all further statutory references are to the Code of Civil Procedure.

We conclude HKS established the existence of a contract between HKS and Vita containing a forum selection clause, but section 410.42 prevents enforcement of the forum selection clause. Accordingly, we reverse.

FACTUAL AND PROCEDURAL BACKGROUND

*The Project*

HKS is an architecture firm and a Texas corporation. C.E. Mammoth LLC (Owner) planned to develop a luxury hotel in Mammoth Lakes (Project). Owner hired HKS to provide architectural services for the Project pursuant to an "Agreement Between Owner and Architect" (Prime Agreement). Among other things, the Prime Agreement contained a Texas forum selection clause providing: "[a]s a condition precedent to the institution of any action [or] lawsuit[,]" that "all disputes shall be submitted to mediation" and that "[a]ll claims, disputes, and other matters in question between the parties arising out of or relating to [the Prime] Agreement . . . be resolved by the . . . courts in . . . Texas." The Prime Agreement also contained a Texas choice of law provision. Additionally, the Prime Agreement authorized HKS to obtain proposals and hire "[c]onsultants" to perform certain work in connection with the Project. The Prime Agreement was revised as of September 11, 2007, but not signed by Owner and HKS until October 2008.

InSite is a landscape design firm with offices in Berkeley and Napa. In October 2007, InSite sent HKS a proposal to provide landscape architecture design services for the Project (Proposal). The "Scope of Basic Services" section of the Proposal stated InSite would: (1) "support [HKS] . . . and other design consultants in the preparation of design and construction documentation[;]" (2) "conduct a series of reviews of landscape construction[;]" (3) collaborate with HKS "for hardscape design of the outdoor environment[;]" and (4) have "primary responsibility for design and construction documentation of all planting, irrigation and associated landscape architectural features." According to the Proposal, InSite would "[w]ork with the selected contractor and their sub-contractors to clarify the landscape architecture issues and assist the contractor in

2

understanding the design." Neither InSite nor HKS signed the Proposal, apparently because it contained provisions unacceptable to HKS.

In November 2007, InSite and HKS signed an "Architect and Consultant Agreement and Release" (Release) wherein InSite agreed: (1) HKS "is or will be in the process of negotiating an agreement with [ ] Owner[;]" (2) "it is not certain that [ ] Owner will execute such an agreement[;]" (3) "Owner may not pay for any . . . invoices submitted by [HKS], including those invoices for services provided by [InSite]. In the event [ ] Owner does not pay [HKS] for amounts due to [InSite] for services rendered and expenses incurred, [InSite] hereby agrees not to take any legal action against [HKS] relative to such amounts and agrees to release [HKS] for any and all liability arising out of non-payment to [InSite] for any amounts of money due [InSite] and/or for the services rendered by [InSite]." InSite also agreed "once a proposed architect-consultant agreement . . . is received by [InSite] from [HKS], [InSite] will have thirty days to review and execute [it]. In the event that the . . . [a]greement is not executed by [InSite] within 30 days of receipt, all payments that may otherwise be due and payable to [InSite] will be held by [HKS] until the [a]greement is executed by [InSite]."

Around this time, Vita acquired InSite. Vita is a California corporation with a main office in Marin County. HKS sent Vita a "Standard Form of Agreement Between Architect and Consultant" (Contract). The Contract states Vita is to perform "[l]andscape architectural services" for the Project. The Contract attaches the Proposal as an exhibit and incorporates it to describe the scope of Vita's services. Sections 1.1 and 1.3 of the Contract incorporate the terms of the Prime Agreement. Section 8.1 provides in relevant part, "[s]ubject to Section 8.2, any claim, dispute or other matter in question arising out of or related to [the Contract] shall be subject to the same dispute resolution provisions as set forth in the Prime Agreement." Section 8.2 provides, "If the claim, dispute or other matter in question arising out of or related to [the Contract] is unrelated to a dispute between [HKS] and Owner, or if [Vita] is legally precluded from being a party to the dispute resolution procedures set forth in the Prime Agreement, then claims, disputes or other matters in question shall be resolved in accordance with this Section 8.2. Any such

3

claim, dispute or matter in question shall be subject to mediation as a condition precedent to binding dispute resolution." Pursuant to section 10.1, the Contract "shall be governed by the law provided in the Prime Agreement."

Neither Vita or HKS signed the Contract, but Vita performed work in 2008 while the Project was in the "design phase" and sent invoices to HKS. Owner began having financial problems before construction commenced; in 2008, work on the Project was "placed on hold." Owner "ceased paying for any work," leaving HKS "with extensive unpaid bills" for its own services, and those provided by its "consultants." HKS obtained a judgment against Owner in 2010 in Texas for $1,617,073.70 but was "unable to recover anything on that judgment, despite diligent efforts to do so."

*The Operative Complaint*

In 2013, Vita filed a complaint against HKS, which HKS answered. Vita's operative first amended complaint (complaint) alleged claims for: (1) breach of contract; (2) unjust enrichment; (3) quantum meruit; and (4) breach of the implied covenant of good faith and fair dealing. In its breach of contract cause of action, Vita alleged "[o]n or about September 11, 2007, [Vita] and [HKS] entered into [a] contractual agreement, evidenced by a writing, a true and correct copy of which is attached hereto as Exhibit A . . . whereby [HKS] agreed to pay for services rendered by [Vita], in connection with the work of improvement known as the '[Project].'" According to the complaint, HKS breached that contract "by failing and refusing to satisfy its obligation to pay" Vita for its performance, and "[a]s a direct and proximate result of [HKS's] breach of the Contract," Vita had "been damaged in the amount of $370,650.53, which includes costs for labor, expenses, and interest." HKS answered the complaint, responded to written discovery propounded by Vita, and attended a court-ordered mediation. HKS also appeared by telephone at two case management conferences.

*HKS's Motion to Dismiss and Vita's Opposition*

Approximately seven months after answering the complaint, HKS moved to enforce the forum selection clause and dismiss or stay the action pursuant to section

4

410.30.[2] HKS argued "the contract upon which [Vita] has filed suit incorporates the terms of [the Prime Agreement], which in turn contains forum selection clauses requiring any action to be filed in . . . Texas." HKS also argued the forum selection clause was "valid, enforceable, applicable to the dispute, and mandatory[.]"

In a supporting declaration, HKS principal Donald Harrier averred Owner hired HKS pursuant to the Prime Agreement, which "provides that any lawsuits must be filed in . . . Texas." In turn, HKS hired Vita as one of its "consultants" on the Project "to provide landscaping architectural services[.]" Harrier sent the Contract to Vita. According to Harrier, while Vita "never signed the [C]ontract, it performed services thereafter, and the parties adopted its provisions by performance thereunder[.]" Harrier explained that HKS had InSite sign the Release — which contained a "pay-if-paid" clause — because HKS did "not want to be in a situation in which it must pay for work performed by consultants, when the [O]wner . . . is not paying [HKS] for that work. . . ."[3] Harrier's declaration attached the Prime Agreement, the Contract, and the Release.

---

[2] The notice of motion stated the motion was also based on "the grounds of *forum non conveniens*" pursuant to section 418.10 but HKS's supporting memorandum of points and authorities presented only one ground for dismissal: the forum selection clause. HKS also moved for summary judgment but the court did not rule on the motion and it is not at issue on appeal.

[3] A "pay if paid provision makes payment by the owner to the general contractor a condition precedent to the general contractor's obligation to pay the subcontractor for work the subcontractor has performed." (See *Wm. R. Clarke Corp. v. Safeco Ins. Co.* (1997) 15 Cal.4th 882, 885, fn. omitted (*Clarke*).) "'[P]ay if paid'" or "'pay when paid'" clauses are unenforceable in California "as a violation of public policy." (*Capitol Steel Fabricators, Inc. v. Mega Construction Co.* (1997) 58 Cal.App.4th 1049, 1058.) The California Supreme Court has held a "general contractor's liability to a subcontractor for work performed may not be made contingent on the owner's payment to the general contractor. . . ." (*Clarke, supra,* 15 Cal.4th at pp. 896-897; see also *Ted Jacob Engineering Group, Inc. v. The Ratcliff Architects* (2010) 187 Cal.App.4th 945, 952, fn. 5 [architect conceded contract contained "an unenforceable 'pay-when-paid' provision . . . void as against public policy"].) Pay if paid clauses are enforceable in Texas. (See *FaulknerUSA, LP v. Alaron Supply Co., Inc.* (2010) 322 S.W.3d 357, 360.)

Vita raised several arguments in opposition. First, it characterized HKS as a "general contractor" and itself as a "subcontractor" and claimed the forum selection clause in the Contract was unenforceable under section 410.42. Vita also argued the case implicated "fundamental public policy concerning pay provisions in subcontractor-contractor contracts," and suggested enforcing the forum selection clause would violate California public policy, under which "pay-if-paid" provisions are unenforceable. Next, Vita argued the motion was untimely and HKS "procedurally waived" its right to enforce the forum selection clause by litigating the case in California. Vita also contended "enforcing the forum selection clause in the unsigned" Contract — which it described as a "contract of adhesion" — would be unreasonable. Finally, Vita claimed there was no contract containing a forum selection clause because the Release did not contain such a clause and because the Contract was "unsigned and the parties intended their final agreement to be reduced to a signed writing[.]" In a supporting declaration, Vita's office manager averred HKS acted "as a general contractor" on the Project and the Contract "called for Vita to provide . . . subcontractor professional design services. . . ." The office manager also stated Vita performed the work required by HKS and "Vita had no interactions, negotiations, or communications with [Owner] concerning Vita's work for the Project. Vita's agreement was with HKS. . . ."

In reply, HKS argued section 410.42 did not apply because HKS is not a contractor and Vita is not a subcontractor. As HKS explained, "[t]his is not a contract for construction. Rather, HKS and Vita are both design professionals, a category of entity very distinct from contractors and subcontractors . . . and this is a design services contract[.]" HKS also claimed it had not waived its right to enforce the forum selection clause and that Vita could not demonstrate it would be unreasonable to enforce the clause. Finally, HKS argued Vita's arguments regarding the execution of the Contract had "no effect" because the complaint attached the Contract and Vita alleged "the [C]ontract memorializes its agreement with HKS."

6

*The Order Granting the Motion to Dismiss*

Following a hearing, the court granted the motion to dismiss and concluded HKS was "entitled to have the action filed in the state selected" in the Prime Agreement. The court determined Vita and HKS signed "a contract with a forum selection clause. The contract is attached to the . . . Complaint as Exhibit A, and [Vita] is suing on the contract. The contract designates Texas as the forum for litigation." Rejecting Vita's waiver argument, the court concluded HKS did not engage in "'profound and extensive' litigation in California." The court also declined to apply section 410.42, concluding "[t]his is not an action between a contractor and a subcontractor for construction, but a contract between design professionals — a landscape architecture firm and an architecture firm." The court entered judgment for HKS.

DISCUSSION

I.

*HKS Established the Existence of a Contract Between HKS and Vita*
*Containing a Forum Selection Clause*

Vita contends the court erred by granting HKS's motion to dismiss because there is no contract containing a forum selection clause. The parties disagree on the standard of review. Vita urges us to review the court's order de novo, claiming the threshold issue is the existence of a contract containing a forum selection clause. HKS contends the court made a factual determination that the parties formed a contract, which we review for substantial evidence.

""""[W]hether a certain or undisputed state of facts establishes a contract is one of law for the court . . . . On the other hand, where the existence . . . of a contract or the terms thereof is the point in issue, and the evidence is conflicting or admits of more than one inference, it is for the . . . trier of the facts to determine whether the contract did in fact exist, . . ." [Citations.]"" (*Alexander v.Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141 (*Alexander*), disapproved on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 524; see also *Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208 (*Bustamante*).) "Mutual assent or consent is necessary to the formation of a

7

contract" and "[m]utual assent is a question of fact." (*Alexander, supra,* 104 Cal.App.4th at p. 141.) Here, the evidence regarding contract formation is conflicting because Vita claims there was no mutual assent and the parties merely had an agreement to "negotiate a more complete contract in the future."

As a result, the existence of the contract is a question of fact, and we must uphold the trial court's finding if supported by substantial evidence. (*Bustamante, supra,* 141 Cal.App.4th at p. 208; *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) Substantial evidence is evidence of "'"ponderable legal significance,"'" "'"reasonable in nature, credible, and of solid value. . . ."'" [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) "The ultimate determination is whether a reasonable trier of fact could have found for the respondent based on the whole record. [Citation.]" (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633, italics omitted.)

We are not persuaded by Vita's claim that there is no contract containing a forum selection clause. In the complaint, Vita alleged it "entered into [a] contractual agreement, evidenced by a writing," and attached a "true and correct copy[.]" As we have explained, the Contract incorporated the terms of the Prime Agreement, including the forum selection clause requiring disputes to be litigated in Texas. "The admission of fact in a pleading is a 'judicial admission.' . . . It is a *waiver of proof* of a fact by conceding its truth, and it has the effect of removing the matter from the issues. Under the doctrine of "conclusiveness of pleadings," a pleader is bound by well pleaded material allegations . . . . [Citations.]' [Citation.]" (*Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271.)

Vita's judicial admissions regarding the existence of the Contract are binding. (*Toro Enterprises, Inc. v. Pavement Recycling Solutions, Inc.* (2012) 205 Cal.App.4th 954, 957 [complaint's allegations established existence of subcontract]; *Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 737 [plaintiff "admitted the existence of the written contract by alleging it" in his unverified complaint]; see also *Food Safety Net Services v. Eco Safe Systems USA, Inc.* (2012) 209 Cal.App.4th 1118,

1127 [allegation in unverified cross-complaint "constituted a binding admission" regarding the terms of a contract].) Vita attempts to avoid the consequences of its judicial admission by claiming it attached the Contract to the complaint merely "as a convenience to illustrate the nature and scope of the work involved in the [Project], to show that the Parties had an understanding as to the scope of the work, and to provide support for Vita's damages claim." Vita also contends it is "entitled to clarify its allegations by filing an amended complaint[.]" We reject these arguments because Vita did not raise them in the trial court. (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417.)

The absence of signatures does not render the Contract unenforceable. On appeal, Vita concedes the parties "conducted themselves as though they had an agreement[.]" There is no dispute Vita performed pursuant to the Contract, and HKS accepted Vita's performance. A "*voluntary* acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." (Civ. Code, § 1589, italics added; see also Civ. Code, § 1584 ["acceptance of the consideration offered with a proposal, is an acceptance of the proposal"]; *Grant v. Long* (1939) 33 Cal.App.2d 725, 736 ["[w]hile an express contract is one, the terms of which are stated in words . . . , one party may use the words and the other may accept, either in words or by his actions or conduct"].) Here, substantial evidence supports the court's conclusion regarding the existence of a contract memorialized by a writing. (*Bohman v. Berg* (1960) 54 Cal.2d 787, 794-795.)

Vita's reliance on *Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348 (*Banner*) does not alter our conclusion. *Banner* held there is no binding contract when "it is clear, both from a provision that the proposed written contract would become operative *only* when signed by the parties as well as from any other evidence presented by the parties that both parties contemplated that acceptance of the contract's terms would be signified by signing it[.]" (*Id.* at p. 358.) Here and in contrast to *Banner*, there is no such condition precedent in the Contract, nor any evidence the parties contemplated acceptance of the Contract "would be signified by signing it[.]" (*Ibid.*)

9

Vita contends there is no contract containing a forum selection clause because the Release demonstrates the parties intended to "negotiate a more complete contract in the future." We disagree for two reasons. First, this interpretation of the Release is completely inconsistent with the allegations of the complaint. Second, the Release states HKS has no obligation to pay Vita if Owner does not pay HKS, and it authorizes HKS to withhold payment for Vita's services until Vita signs the Contract. The Release's reference to the Contract does not — as Vita suggests — "provide[ ] assurances" the parties "would negotiate a more complete contract in the future." It simply states Vita will not get paid until it signs the Contract. This situation is unlike *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251 (*Copeland*), where the parties signed a contract providing they would eventually negotiate a "separate [ ] agreement." (*Id.* at p. 1254.) Nothing in the record suggests Vita and HKS entered into a contract to negotiate like the one at issue in *Copeland.* To the contrary, Vita acknowledged in the Release it would not be paid if it failed to timely execute the Contract.

We conclude substantial evidence supports the existence of a contract between HKS and Vita containing a forum selection clause.

II.

*Section 410.42 Bars Enforcement of the Forum Selection Clause*

Vita contends section 410.42 bars enforcement of the forum selection clause. "California favors contractual forum selection clauses so long as they are entered into freely and voluntarily, and their enforcement would not be unreasonable. [Citation.] This favorable treatment is attributed to our law's devotion to the concept of one's free right to contract, and flows from the important practical effect such contractual rights have on commerce generally." (*America Online, Inc. v. Superior Court* (2001) 90 Cal.App.4th 1, 11.) Nonetheless, "California courts will refuse to defer to the selected forum if to do so would substantially diminish the rights of California residents in a way that violates our state's public policy." (*Id.* at p. 12; *Intershop Communications v. Superior Court* (2002) 104 Cal.App.4th 191, 200 ["a forum selection clause will not be

10

enforced if to do so would bring about a result contrary to the public policy of this state"].)

Section 410.42 precludes out-of-state contractors from requiring California subcontractors to litigate certain contract disputes in the contractor's home state. It renders "void and unenforceable" a "provision[ ] of a contract between the contractor and a subcontractor with principal offices in this state, for the construction of a public or private work of improvement in this state" that "purports to require any dispute between the parties to be litigated, arbitrated, or otherwise determined outside this state" or that "purports to preclude a party from commencing such a proceeding or obtaining a judgment or other resolution in this state or the courts of this state." (§ 410.42, subds. (a)(1), (2); *Templeton Development Corp. v. Superior Court* (2006) 144 Cal.App.4th 1073, 1081 (*Templeton*).) Section 410.42, subdivision (b) defines "'construction'" as "work or services performed on, or materials provided for, a work of improvement, as defined in Section 8050 of the Civil Code, and for which a lien may be claimed pursuant to Section 8400 of the Civil Code[.]"

Section 410.42 is intended to "'provide California subcontractors with the protection of California courts and law to which they are entitled'"" including "the prompt pay laws."'" (*Templeton, supra,* 144 Cal.App.4th at p. 1083.) According to the statute's legislative history, "'large out-of-state general contractors have an unfair bargaining advantage when negotiating with California subcontractors. This advantage, they argue, is evident when the subcontractors are forced to sign contract provisions that waive their right to have disputes resolved in California or lose the contract. Further, they argue that permitting general contractors to choose their home state as the site to resolve all contract disputes is unfair "when all the work was done in California and all witnesses and evidence are available in this state." They suggest that subcontractors often are forced to [forgo] attempts to resolve disputes in the general contractor's home state for economic reasons even when they have a meritorious case.' [Citation.]" (*Ibid.*) At least 24 states have similar statutes voiding forum selection clauses requiring construction disputes to be adjudicated outside the state where the project is located.

11

(See Travers et al., Forum-Selection Clauses After Atlantic Marine (Summer 2014) 34 Construction Lawyer 6.)

Section 410.42 does not define "contractor" or "subcontractor" and we are aware of no cases interpreting these terms.[4]  We apply a de novo standard of review to issues of statutory construction.  (*Nguyen v. Western Digital Corp.* (2014) 229 Cal.App.4th 1522, 1543.)  "'The objective of statutory construction is to determine the intent of the enacting body so that the law may receive the interpretation that best effectuates that intent.  [Citation.]  "We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent.  [Citation.]  The words of the statute should be given their ordinary and usual meaning and *should be construed in their statutory context*." [Citation.]  If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls.  [Citation.]'  [Citation.]" (*Templeton, supra,* 144 Cal.App.4th at p. 1081.)

Black's Law Dictionary defines a contractor generally as "[a] party to a contract" or more specifically as "one who contracts to do work or provide supplies for another." (Black's Law Dict. (9th ed. 2009) p. 375.)  Here, HKS is a contractor, because it contracted with Owner to design the Project.  (See *Chapman v. Edwards* (1933) 133 Cal.App. 72, 76 ["[a] contractor, obviously, is one party to a contract or one who has contracted to do or perform certain work"]; see also Civ. Code, § 8012 [broadly defining a "'[c]ontractor'" as "a direct contractor, subcontractor, or both"].)  We are not persuaded by HKS's contention that section 410.42 does not apply because it is not a "general contractor," which "construct[s] improvements," but rather a "design professional."  In industry parlance, a "'contractor'" may be "synonymous with 'builder'[.]"  (See Bus. & Prof. Code, § 7026; see also *Templeton, supra,* 144 Cal.App.4th at p. 1076 ["electrical

---

[4]     In *Templeton,* the only case interpreting section 410.42, the court concluded the phrase "'otherwise determined'" included mediation.  (*Templeton, supra,* 144 Cal.App.4th at p. 1082.)

12

contractor" sued "general building contractor"].)  But the term "contractor" in section 410.42 is not limited to builders, nor does it exclude an architect or design professional.[5]

Black's Law Dictionary defines a subcontractor as "[o]ne who is awarded a portion of an existing contract by a contractor, esp[ecially] a general contractor." (Black's Law Dict., *supra,* at p. 1560.)  Civil Code section 8046 also broadly defines a subcontractor as "a contractor that does not have a direct contractual relationship with an owner.  [It] includes a contractor that has a contractual relationship with a direct contractor or with another subcontractor."  Here, Vita is unquestionably a subcontractor because it was "awarded a portion" of HKS's contract with Owner and because it did "not have a direct contractual relationship" with Owner.  There is no dispute that Vita did not interact, communicate, or negotiate with Owner concerning Vita's work for the Project.  (Black's Law Dict., *supra,* at p. 1560; Civ. Code, § 8046; see also *Union Asphalt, Inc. v. Planet Ins. Co.* (1994) 21 Cal.App.4th 1762, 1767 (*Union Asphalt*) [broadly construing "'subcontractor'" in former Civ. Code, § 3104 as including "all persons who agree with the original contractor"].)

HKS argues the Legislature was aware of the difference between contractors and subcontractors on the one hand and architects and design professionals on the other, and intentionally excluded architects and design professionals from section 410.42.  To support this argument, HKS refers us to numerous statutes, including Civil Code section 8400, which lists the entities entitled to a mechanics lien as including direct contractors, subcontractors, and design professionals.  (Civ. Code, § 8400, subds. (a), (b), (f).)  We are not persuaded.  Civil Code section 8400 does not — as HKS contends — distinguish between contractors, subcontractors, and design professionals.  The statute simply lists entities entitled to a lien.

---

[5]     Business and Professions Code section 7026 defines "contractor" for state licensing requirements.  Because this case does not concern state licensing requirements, that statute does not aid our analysis.  HKS correctly notes various statutes defining and governing design professionals.  These statutes are distinguishable in this context.  Nothing in section 410.42 precludes design professionals from also being contractors or subcontractors.

Nor does HKS's reliance on Civil Code section 8404 alter our conclusion. Under Civil Code section 8404, a "work of improvement" is "authorized" when "provided or authorized by a direct contractor, subcontractor, architect, project manager, or other person having charge of all or part of the work of improvement or site improvement." (Civ. Code, § 8404, subd. (b).) That "design professional" is listed in this statute and in various other Civil Code sections does not mean architects and design professionals cannot also be contractors or subcontractors under section 410.42 and the authority discussed above. (See *D'Orsay Intern. Partners v. Superior Court* (2004) 123 Cal.App.4th 836, 838 ["licensed general contractor . . . provided . . . design related services, both by performing design and planning services, and by hiring design professionals"].)

This case presents the very situation section 410.42 was designed to prevent: one where a California subcontractor performs work in California but is forced to litigate its dispute out of state, in a forum with laws unfavorable to the subcontractor. "In interpreting statutes, we must presume our Legislature intended reasonable results. Where there are two possible constructions, one leading to mischief or absurdity and the other to a result consistent with justice and common sense, the choice is self-evident." (*Union Asphalt, supra,* 21 Cal.App.4th at p. 1765.) Our interpretation of section 410.42 leads "to a result consistent with justice and common sense[.]" (*Union Asphalt*, *supra*, at p. 1765.) We conclude section 410.42 precludes enforcement of the forum selection clause requiring Vita to litigate its dispute against HKS in Texas.

Having reached this result, we need not consider Vita's argument that the motion to dismiss was untimely and HKS waived its right to move to enforce the forum selection clause. We also decline to consider whether the "pay-if-paid" provisions in the Contract provide an additional basis to invalidate the forum selection clause.

DISPOSITION

The judgment is reversed. Vita is awarded costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

_____

Jones, P.J.


We concur:


_____

Needham, J.


_____

Bruiniers, J.


A141010

Superior Court of the County of Marin, No. CIV1300681, Lynn Duryee, Judge.

Epstein Law Firm, Robert F. Epstein and Lopez Law Firm, Michael B. Lopez for Plaintiff and Appellant.

Schwartz & Janzen, LLP, Steven H. Schwartz and Noel E. Macaulay for Defendant and Respondent.

A141010

16